I think we all understand that the relationships have changed. If you want to save a minute, switching seats will. If you need to whisper something to Mr. Lieberman at some point, you're free to get up and move over, Mr. Trella. We understand that things have changed a little bit. Mr. Verhoeven, you're now alone. I have a little bit more time. That is correct. You have a little more time. Thank you, Your Honor. May I please have the court? The 566 patent should be invalidated for two reasons. First, it's anticipated by the Apple Newton, and second, it is a poster child for obviousness under KSR. I'll start with the Apple Newton, if I may. And again, I think it's important to look at the procedural history surrounding the arguments that are being made on appeal. It's important, I think, to note that in the pre-hearing brief that was submitted before trial, Microsoft only said one limitation was missing from the Apple Newton. And it was, quote, electronic mail scheduling request object. The only limitation they disputed. But the ALJ found more, and we don't have a basis for saying waiver, so what's the point of this? Well, no evidence. The point, I guess, Your Honor, is if you look at the evidence at the trial, it's basically undisputed that the element that the ALJ found was missing was there. We presented evidence that was there, and their own expert, so our expert, Dr. Locke, testified that it was there, and then Microsoft's own expert, Dr. Smith. You have to show it's necessarily and always there, don't you? If it's not expressly there, you're working on an inherency principle, right? And so you have to show us that the sync component is actually in the PDA, don't you? Or necessarily there. And that's what the evidence showed. And now, the Newton is, okay, well, in addition to their experts admitting the sync component is in the Newton, when you buy the Newton, the evidence shows you get software called the Newton Connection Utilities Software. It comes with the Newton, okay? It resides on the desktop. Yes. But the whole point of this is you're synchronizing with the desktop of the Newton. Is your theory any different from the proposition that if two devices sync, there must be something in both that makes that happen, and whatever that something is must be a sync component? Well, in order for something to sync, our proposition, our point is, there has to be a protocol. Computer scientists would know that. Is a sync component something which accomplishes the synchronization or simply accepts the synchronization? I mean, a sync component is something that permits, as in the claims, an object to be synchronized between two different devices. That's all that's being claimed. The claim and the spec, I thought, contained language that is substantially less passive than that. Well, there's a synchronization manager, but there's a distinction. No, but the claim talks about the synchronization component doing synchronizing, not simply allowing or, and the specification examples seem to do the same. If there's any level of activity, of direction, of initiation, of command, I don't see that you so establish the presence of that that a contrary finding by the commission would be lacking in substantial evidence. Well, if you look at, I think I have the claim here, synchronization, I'm going to quote it, synchronization component configures to synchronize individual objects stored on the object store, that's a mobile device, with remote objects stored on the remote object store, that would be the desktop computer. So, it's very general, and it's talking about an object, and if you look at the text evidence that you get, the user manager. I'm reading that language and hearing a lot of what Judge Toronto said in that language. It's a component that's configured to synchronize. It suggests this initiation, this, I like his active-passive suggestion, and it seems that there is this active component. Rather than just a receiver, I'll accept your synchronization if you happen to get in touch with me. If I could cite to the evidence, I think it shows that. In the blue brief on page 16, we have reproduced an image that's on the Newton PDA. Alright, how does that, this is... It's a button you tap to synchronize. So, you've got the Newton, you're using it, you hit the button, it's synchronized. So, wouldn't that be active? What testimony is there about how that is accomplished? Well, there's... I thought it was just the picture where you've established a connection, whether by wire or wireless, with the connection utilities, the thing in the desktop. And is that anything other than, at that point, treating the peripheral, treating the handheld device as a peripheral in which you can, I guess with a stylus at that point, click something, but that all of the control, all of it, is back in the desktop? Well, admittedly, that picture doesn't talk about how the software works, but the user manual that describes the functionality of the software specifically talks about how the Newton lets you synchronize. So, for example, A74228, synchronization lets you keep applications on your Newton PDA up to date with applications on your computer. Applications are objects. There's no doubt that the Newton allowed synchronization to take place. The question is, if one does not accept the proposition that a synchronization component is by definition always present in any two devices that can be synchronized, what more is there? And I'm not sure that there's any more evidence, any evidence of some greater functionality, something that moves it to the active side of the active-passive distinction. Well, I believe we've cited evidence that talks about how the Newton uses Newton 2.0 operating system. You can't synchronize with an earlier version. On A74174, it says, quote, keep your application synchronized by updating information on both your computer and your Newton PDA. The claim language here is not requiring more than you have an object and you synchronize it on two different devices. That's what the element says. And I would submit what that language I just read that I cited to says. And I don't believe you need to do more. Now, the specification does talk about additional functionality that's not claimed with respect to the synchronization manager. But it also says in the specification that the synchronization manager can be either on the desktop or on the mobile device. So, we think the evidence shows what's needed for the claim. I should move on to obviousness, if that's okay. You may. Wait a second. So, in addition to the anticipation argument, just by looking at the patent itself and reading the background of the invention section, the patentee has admitted that all elements that are being claimed or asserted claims that are being asserted against us existed in prior Microsoft software that was commercially available. Now, the administrative law judge says no first gram factor. Well, I think you show that there is scope and content of the prior art that supports your obviousness. Looking at the record, I would submit that the ALJ either was confused or thought we were relying on Newton art instead of other art. But in terms of the scope and content of the prior art, if you look simply at the background of the invention, discretion in the actual patent, there's admissions that all of these elements in Schedule Plus are the same. They match up directly with the claims, with one exception, the preamble of the claims, which says mobile device. In addition, Microsoft's expert admitted, Your Honor, that all elements of the claim are in the Schedule Plus prior art. We cited that extensively. I think it's important to remember we were... All elements except... Except mobile device. Right. So this is a pattern in which the inventors say, We've been doing all this stuff on desktops all the time. We now, it would be great if we could do it on mobile. But there are serious problems to overcome in being able to do what we all know we would like to do. So what is the prior... And nothing in the spec says, Here's the prior art that has the techniques in it for combining in order to solve the problem, a obviously recognized problem. That's what was needed for GRAM Step 1. Well, there's... If you look at the problems that are identified in Microsoft's brief, none of them are claimed with the exception of the global identifier in Claim 2. So they talk about these alleged problems, but there's no claiming of a solution. All they claim in the elements is the prior art with a preamble that says on a mobile device. So they haven't invented anything, if that's the case. They haven't claimed what they're saying is the solution to all of these problems. I would submit this is classic, like LeapFrog, where you've got memory increases, computer CPU increases, all these different things they didn't invent increased so that you're able to now do this technology on a smaller computer, a mobile device. And that's classic LeapFrog. But aren't the cases, those cases, don't they all, didn't they all involve some measure of proof that going from one venue to the other was easy to do? It was easy to see how to do it. So that... And that was the critical part. And that's what it doesn't appear to have been presented in any kind of disciplined, organized, gram-factor-based way by your proof. Well, I think that, for example, if you look at LeapFrog, I believe the facts in that case, you had a mechanical aspect of the toy. And they claimed an invention that uses a CPU and makes it electronic. That's it. I mean, what else, what more, and it was well known that you could do this? Ah, well, see, that's the part. It was well known that you could do this. Isn't that what this patent says was not well known, and it took some real inventive work to figure out how you do that on devices that had limited memory capacity, in which there was a problem about overloading with duplicative messages, and I forget what the other... Well, none of that's claimed. I go back to that. I mean, if you invent something, Your Honor, you have to claim it, and you have to... You know, that's the whole bargain you get to get your patent. If you come up with something new, and you have to claim it and limit yourself to the solution. And that's not what has happened here. Every single... These things you're talking about are not anywhere in the claims. And so, I go back to, well, we've got to look at the claim, what is the invention, and are these elements in the claims, what is new? And simply saying, on a mobile device, is not an invention, I would submit. And if you look at the claims and limit and hold them to the actual elements of the claims, and say, what's new in these claims, that this would be a KSR situation. And I think I've used up my... We're going to restore your rebuttal time, treat you as we did Mr. Trella, Mr. Verhoeven. Thank you, Your Honor. But that'll be... We'll take care of that in a moment. Mr. Lieberman, you may proceed. Thank you, Your Honor. Well, in this case, Motorola essentially, the main thrust of Motorola's infringement, I'm sorry, infringement argument is... Accuracy in his suggestion that technology was moving towards miniaturization, and therefore it was not a great inventive leap to finally get this on a PDA. Well, technology was moving, but there was very serious difficulties in implementing this synchronization on the mobile device. Synchronization involves... It's a complex process, which is very demanding on the computing resources. It involves comparing data on mobile device and the desktop computer, resolution of the conflicts, and other things that actually require a lot of power and a lot of memory. And actually, Motorola itself admitted that and described generally that it's preferable to implement synchronization at the desktop level as opposed to mobile device. And we actually discussed this in our brief, and although Motorola stated that they withdrew, they considered infringement, and therefore there is no inconsistency in their position. But the Commission never referenced any evidence that was withdrawn. We just touched on the general description that Motorola provided of the synchronization process. And so, based on this description, it's clear that just having a desire to implement something on a mobile device is not sufficient. The resources of a mobile device did not allow to implement this active synchronization component. It may be various degree of activity, but still it should be some participation of the mobile device, as opposed to just communicating at the lower level of software. Let me shift to the anticipation side now. Why doesn't that button on the Apple Newton that says synchronize, why doesn't that indicate a component in the PDA? Well, there are several reasons. Well, one is there is no such thing, I mean, if you look into the claim, and if you look into this button, I mean, it's no question that there is no, they are not only identical, but there is no place for this type of manual procedure. Here in the claim they are talking about computerized process that doesn't include any participation of an individual pushing the buttons. But then, if you just read the Newton Connection Utilities User Manual itself, you know, I tried to avoid reading stuff, but here I think it may be useful. Just maybe two sentences, and then it will make it clear what we're talking about. That's page 74228. Now, Connection Utilities Manual, I'm sorry, Connection Utilities, it's undisputed, essentially, it was stipulated that it's installed on the desktop computer. So that's the provision from the manual. When you synchronize, the Newton Connection Utilities compares information from a file on your computer with information in your Newton application. Then the information is combined and updated based on the latest changes. So it's clear that it's performed by the Newton Connection Utilities itself. And that perfectly fits to the description that we have in Motorola's brief. You know, it's performed at the higher level, at the desktop level of the system. And that's unquestionable evidence, you know, substantial evidence that would support the LGA's finding that there is no infringement. Okay, I also wanted to briefly touch on the domestic industry, if I may. So, now, talking about global identifier, it is the same logic applies here. The same thing that I was discussing about infringement by inherency. For the same reason, Motorola fails to show that claim two is anticipated and that there is a global identifier on the mobile device. I just don't want to spend too much time on that. So I'm moving to domestic industry. Now, domestic industry. First of all, I just wanted to know that Motorola argues that the commission admitted that Windows operating systems do not practice the asserted patents. That's in reply on page 31. This is not true. The commission never made such an admission. But then I want to talk about this new term that Motorola invented. It's a non-practicing component of third-party products. First of all, this term is used without citing any authority and without explaining what it means. Now, but also using this term is actually indirect. It's inconsistent with the statute. The statute itself doesn't use this term. And the statute provides that… Can the economic prong be met by investment in a component of the article protected by the patent? We believe yes, Your Honor, because… Just a component. Yes, it's a component, yes. And there may be different components. I'm trying to kind of predict the next question. We can put it into extreme. There may be components that are more related to the patent feature or less. But that's the question of what way the judge will give to the investment to this particular feature. So yes, per se, there is a possibility to satisfy economic prong by investing in the components. Now, in this case, it's no question that operating system is number one if we use the phraseology of Motorola. But it's the commission's view that that test could never satisfy the technical prong, right? Or could it? If it's just one portion, one component. Well, we're talking about economic prongs. Well, I know. That's why my question was, is it the commission's view that with respect to the technical prong, that too could satisfy the technical prong? Well, for the technical prong, the complainant has to show that the product the complainant relies on is covered by the patent. And therefore, it's a little bit different angle of looking at things. Protected by. Is that the same as covered by? Well, I would agree with Motorola's view in this case. And I would say yes. The difficulty is that the statute, which doesn't speak to a technical component specifically or an economic component, seems to use throughout the same phrases. The same phrases with respect to articles, etc. that you rely on for the economic prong are always used, are they not, for description and analysis of technical prongs, right? Well, you're telling us that two different standards apply, right? I'm sorry. The economic prong and the technical prong is an outgrowth of the commission practice. They started with the interpreting plain language. And I believe that Judge Larkin was the first who came up with these terms. And then they became more and more common. And now even this court is using these terms. For example, interdigital use these terms and not only interdigital. So, I'm just saying that there are different ways of expressing the same thing. It just became a matter of practice, common practice to use these terms. Thank you, Mr. Lieberman. Let's ask Mr. Trella. Thank you, Mr. Lieberman. And we can give Mr. Trella an extra three minutes and that will balance our time on each side. Thank you, Your Honor. Let me start with obviousness. What we have here is a situation where, and the patent itself recites, desktop software, desktop personal information managers can do all this stuff. Wouldn't it be great to have that on a mobile device? That's what the patent says. The patent goes on in columns three through five to enumerate, well, here's all the reasons why this is really a problem, why it hasn't happened yet, and why it's difficult to do. And then the patent basically comes up with a solution. Now, Mr. Verhoeven argued that, well, none of these supposed solutions were claimed. Well, that's not right. In fact, each of them you can find in the claim language. Claim one requires a synchronization component. Claim one and six address the electronic mail transports. Claim two specifies the global identifier. And claim five requires the abridged context database. And these track through the problems identified in the specification. Furthermore, I'm sorry, are those components in these claims, did they have their counterparts in the pre-mobile desktop versions of all of this? I don't think so, and I'll just give you one example, and that is the abridged context database. I don't think that there was a counterpart to that in the desktop part because, among other things, you didn't need it. The whole point of that was to address the limited storage capacity of mobile devices, and so you came up with this abridged database that then would communicate with the desktop to get the... But that's not in claim one, right? That's not in claim one. That is in claim five. So it is claimed. Is the following right or wrong, or need amendment, that for obviousness, even if none of the how-to solutions are in the claims, that the prior art collectively has to enable what is claimed? So that the technical solutions that make the broad claim work don't have to be in the claim, assuming that your spec enables the claim, but their obviousness material has to, among other things, be enabled? I think that's exactly... I think that's right. I really want to be told if this is wrong. Don't just accept it because it sounds like it's helpful, please. No, no, no. And in fact, it's the second point I was going to make on this overcoming obstacles thing. Mr. Verhoeven's argument was, well, these specific solutions to the problems are not in the claims, A, that's wrong, and B, to go to your point, Your Honor, I don't think they have to be in the claims. There's no case law that says that every detail of how you get from point A to point B has to be in the claims. The point is that to get there, the inventor had to overcome obstacles, otherwise this solution wouldn't work, and that's at the core of the obviousness inquiry. So I don't think there's any case law support at all for the proposition that every obstacle you had to overcome, the way you did that, has to be in the claims. I don't think that's true at all. Is that responsive to your question, Your Honor? Now, looking at the anticipation question, the whole premise of Motorola's argument is, and one of the members of the panel, I think, said this earlier, that the Newton could be synchronized. In order to synchronize, you must have a sync component on both devices, and ergo, the Newton anticipates. Well, there's no record support for that. If you look at Motorola's brief, what they cite for this proposition that you need to have a synchronization component on the mobile device in order to synchronize is the patent's description of the patented invention. The specification lays out the preferred embodiments, talks about having the sync component on the mobile device, and that's what Motorola cites for this proposition that there must have been a sync component on the Newton. And again, originally they said it was the Newton connection utilities, then they abandoned that position, then they point generally to the Newton operating system, the system 2.0, but other than saying, well, it enables communication, which is a purely passive sort of thing, it is not the synchronization component required by the claims, which require a synchronization component configured to do specific things. Was there a claim construction of synchronization component that, I guess, full stop was there? I don't think so. I think, and certainly there's nothing that anybody disputed, I think it was just taken as the term in the claim, synchronization component configured to synchronize objects on a remote data store with the other data store. You heard the discussion earlier about the active-passive aspect of synchronization component. What best supports your active version? I think two things, Your Honor. One is the claim language itself. It doesn't say a synchronization component that allows synchronization or that responds to requests. It says configured to synchronize. It's very active language. And then if you look at the specification, and Mr. Rehobond referred to the specifications description of the synchronization manager. A couple of problems with that. One is it was talking about a specific embodiment. Second, even in the discussion of that embodiment, it makes clear that the synchronization components are playing an active role. And then if you look at column 18, near the bottom of that column, it identifies, it refers to, I think it's items 95 and 97 in figure 5. And it says those are the synchronization components in the embodiment. And the synchronization components in that figure include the synchronization manager. So even accepting that view that the synchronization manager is doing all sorts of important things, it's part of the synchronization component in the embodiment that's being discussed. So the synchronization manager argument doesn't get anywhere. Let me just turn briefly to, oh, one other point on the obviousness arguments. There is, Mr. Verhoeven, both today and in his briefs, focuses on, largely on claim 1. We think he's wrong about that for a variety of reasons. We think the Commission got that right. But there are also four dependent claims that each independently would support the exclusion order. He doesn't address in his briefs claim 5 at all. There's no suggestion that, any argument as to why that would have been obvious. Claim 6, there's minimal discussion and it's not responsive to the testimony before the Commission. And as to claim 2, that's the one that requires the global identifier. The argument there relies really on a misreading of the specification. Specification refers to schedule plus 2.0, which according to Motorola had a global identifier. But it indicates that schedule plus 2.0 was an embodiment of the invention. So that doesn't establish anything about the content of the prior art. Can I ask you a very, I guess, technical question? In figure 5, where it says sync interface component, there's one 100 and one 108. Are those the synchronization components or is that interface something different? Well, what the specification, and actually I had the numbers wrong when I... Yeah, you meant 97 and 99. I did, yes. What column 18 says is that the synchronization component, it says synchronization components 97 and 99. So the specification appears to be identifying that whole box. Each of those whole boxes asks the synchronization component, which includes, has the sub-components. But the specification also indicates that the sync interface component, it does focus on that in a couple of places, that it's playing a very active role. And that's on the mobile device. You referred to the sync manager a moment ago as in both places. But doesn't the spec tell us that can reside only on the desktop? No, it doesn't. Again, in a particular embodiment, it says it can reside on a mobile device or on the desktop or on both. But again, that was a particular embodiment. And here where you're talking about the sync component, it's quite clear that it has to be on the mobile device and it has to play an active role. Now, on domestic industry, let me just touch on that very briefly. Here, I agree with Mr. Lieberman that investment in a component, certainly a significant component like the operating system, is investment with respect to articles protected by the patent. Also, in this case, the Judge Essex found and the commission affirmed that Microsoft really was involved in manufacturing these devices. It's not just putting a component on a shelf that somebody goes and buys. It works actively with the makers of the hardware to integrate the operating system with the mobile devices. I'm interested in having you address Judge Prost's earlier question. The language is the same and yet they're interpreted, the economic and technical prong are interpreted differently. Well, frankly, Your Honor, that I think is an example of a situation where sort of through an iterative process over time, the commission has possibly gotten away from the language of the statute. If you go back, if you start from first principles and just go to the text of the statute, you'd be hard pressed to find a technical prong and an economic prong. What you've got is in subsection two, it says you have to have a domestic industry relating to articles protected by the patent. Subsection three doesn't say, oh, and you also need this. It says, for purposes of determining whether you've got what we've just required in part two, you can look at these three subparts, A, B, and C. I actually think, although InterDigital does talk about economic and technical prong, it really takes, I think, a more integrated approach. There's not some sort of a rigid barrier between the two where something that can be a protected product for one isn't for the other or where there's some difference between the relationships, between the investments and the industry. I think if you go back to the language of the statute and certainly the intent, it contemplates a much more integrated approach and not this sort of, you establish this and then a completely different inquiry for this. Thank you, Your Honor. Thank you, Mr. Torello. Mr. Verhoeven, you have five minutes. Thank you, Your Honor. Counsel from Microsoft said, well, the synchronization component with respect to the Newton and anticipation argument. Synchronization component is, you should look at the spec and there's a lot of detail about that in the spec. But the claim doesn't claim those details. The claim only says synchronization component that synchronizes an object. And as you heard, there was no claim construction on this. The reason there was no claim construction is it wasn't disputed below. But if we're going to incorporate the spec, we have to construe this claim in a more limited manner, which will raise non-infringement issues. So we can't just import from the spec at this stage and construe synchronization component more narrowly than what its ordinary meaning is. We can't add the limitations of the spec and say, well, we need to interpret this to have these specific details from the spec. That's the whole point of claiming. You need to be very precise, and if there's a dispute about it, you need to construe it. Of course, we're in this difficult area of whether we're using the spec appropriately or not to enlighten the claim, or are we importing limitations? How would you help us with that in this context? If you look at the claim itself, it uses terms that people of ordinary skill in the art will understand. It's a synchronization component. Well, computer scientists understand what synchronization is. Even lay people understand what synchronization is. And it talks about what are you doing? You're synchronizing an object, and people know that could be an application or some sort of program. And that's all it means. And if you go and add other limitations from the spec into it, you're narrowing that claim, and we should have the right then to know what that narrowing is. Doesn't Figure 5 give you a pretty good picture? No, I don't think so. Because as you just heard, Figure 5 depicts the manager on both places, but in the spec it says it doesn't have to be. So, you know, that's... You can't run into some real trouble if you start, after the fact, importing limitations of claims without a formal claim construction process. And if you do change the meaning of the claim from its broad plain and ordinary meaning, then we have to go all the way back and assess whether those additional limitations are found in the accused technologies. Can you talk for a minute about the portion of your pre-hearing brief that's quoted extensively in the commission's brief? And I guess it's quoted there for the idea  you said that there, in fact, could be synchronization even without a synchronization component in the mobile device. Well, the short answer is we abandoned those arguments and we stipulated to infringement. Those are non-infringement arguments. And we shouldn't... We should be permitted to do that without punishment. And... In doing so, you must have conceded the claim construction that you're now wishing to contest a bit. Exactly. In doing so, we are saying plain and ordinary broad meaning for the synchronization component. And if you look at just the regular meaning of synchronization component, and by the way, there is evidence as to what a person of ordinary skill in the art would understand on that synchronization the broad claim language. We submitted expert testimony from Dr. Locke, who said what of ordinary skill in the art would understand that the Newton connection utilities would require that each of its functions, including synchronization functions, be involved in communication protocols. And that the software would need to be executed on both ends of the connection, i.e. software being executed on the Newton message pad and software being executed on the desktop computer. And Microsoft's expert was presented with that and I asked him. And similarly, with synchronization component, I have just depicted a quote from Dr. Locke's witness statement where he opines that that element is meth and depicted the evidence he cites to below. You don't dispute his opinion on that element as well, correct? Answer, no, I believe I do not. And I further asked him the one element that they were challenging, if he's wrong on that, would you admit that the Newton anticipates? He said, so if this tribunal concludes that your interpretation of this phrase, electronic mail scheduling request, is too limited and that a less limiting email would satisfy it, then you don't dispute that Newton anticipates claims one, five, and six, right? Answer, I believe that is the only limitation in the Newton, yes. That was the record below, your honors. So if you take the plain meaning of synchronization component as understood by both of these experts, it's anticipated. Now really briefly, I know we have 10 seconds here. Give us your final thoughts. Well, I just want to address on obviousness, a statement was made that the abridged database was new and was claimed in claim five. If you read claim five, there's no reference to an abridged database. And the evidence of record shows that all the dependent claims, as well as claim one, that were asserted here, existed in Schedule Plus in the prior audit. Thank you very much, your honors. Thank you, Mr. Rohovan.